been so clearly shown in the opinion rendered by Judge STRAUSS upon the rule for new trial that we deem further discussion unnecessary. In any view that may be taken of the case it is very clear that permitting the cross-examination of the defendant's witness was not an abuse of discretion to the injury of the defendant.

The assignments of error are overruled and the judgment is affirmed.

---

# Harmon, Appellant, *v.* Sutton.

*Equity—Cancellation of deed—Findings of fact—Evidence.*

A decree dismissing a bill in equity for the cancellation of a deed will not be reversed by the appellate court where it appears that the only evidence offered by the complainant was her own testimony, that such testimony contradicted all the papers which she had signed and also material averments of her bill, and was itself contradicted by the other witnesses in the case, and that the complainant herself was an elderly woman with violent animosities and a defective memory.

Argued Oct. 21, 1914. Appeal, No. 147, Oct. T., 1914, by plaintiff, from decree of C. P. No. 4, Phila. Co., June T., 1912, No. 2,915, dismissing bill in equity in case of Martha C. Harmon v. Isaac C. Sutton, Alice C. Rose and William Rose, her husband, Clara Boyle, Laura C. McGraudy, Alice Rebecca Bristow, Laura C. Schudder, Wallace C. Onimus, Louise Cummins and Herbert A. Davidson, Administrator d. b. n. of Mary Clough, deceased. Before RICE, P. J., ORLADY, HEAD, KEPHART and TREXLER, JJ. Affirmed.

Bill in equity for the cancellation of a declaration of trust, a judgment note and a lease. AUDENRIED, J., filed the following adjudication:

### FINDINGS OF FACT.

1. The houses known as Nos. 4847 and 4849 Haverford avenue, Philadelphia, with the lot of ground on

which they are erected (described at length in paragraph 3 of the bill) formerly belonged to William Clough, who left surviving him as his heirs at law a son, George W. Clough, and seven daughters, viz.: Ellen R. Nields, Alice C. Rose, Maria Onimus, Clara C. Boyle, Laura C. McGraudy, Mary Clough and Martha C. Harmon, the plaintiff herein.

2. Benjamin R. Nields, one of William Clough's sons-in-law, was granted letters of administration on his estate. In order to pay Clough's debts, consisting principally of a note that Nields produced, the sale of his real estate above mentioned was made under an order of the orphans' court. The purchaser is supposed to have been acting in Nields' interest. It is certain that the properties subsequently came into Nields' hands, and that he mortgaged them to The Pennsylvania Company for Insurances on Lives and Granting Annuities as security for a loan of $2,500. Soon afterwards he disappeared from Philadelphia, leaving his wife without support. The latter thereupon caused a warrant of seizure to be levied on the properties, and obtained an order from the court of quarter sessions sequestrating the rents, which thereafter, so long as she lived, were collected by the poor authorities of the city and applied to her support.

3. The children of William Clough were convinced that their brother-in-law had defrauded them in this matter; and one member of the bar after another was applied to for help in regaining the real estate that their father had owned. All attempts, however, to set aside the orphans' court sale were unsuccessful, and most of the Clough family abandoned hope of its recovery. Mrs. Harmon alone was not discouraged. She was bent on obtaining what she regarded as her rights. Her persistence may have been due to her natural pugnacity, or to a love of litigation, but most probably to the fact that having become almost blind she was unable to work and that thus her mind was left free to brood over her

wrongs. Moreover, she had not married until she was forty years of age, and it was largely due to the earnings that she brought home while she lived with her father that he was enabled to acquire the Haverford avenue houses. The recollection of this fact made her more keen to regain them than were her brother or her sisters, and she sought advice on the subject in all quarters. Among other persons to whom she told her story were the officers of the legal aid society. By them she was referred to the defendant Isaac C. Sutton, one of the junior members of the bar.

4. On October 10, 1904, the plaintiff, with her sister, Mary Clough, called at Mr. Sutton's office and laid her case before him. She paid him a retainer of $5.00 and offered him a fee of $1,000 if he would get back for her family the Haverford avenue properties. Gathering from what she said that there were other parties interested in the matter besides Mrs. Harmon, Mr. Sutton instructed her to get her brother and her sisters to join in a letter requesting him to act for them as well as herself and undertaking to contribute toward the expenses of the case. A few days later Mr. Sutton received a letter of which the following is a copy:

"PHILADELPHIA, Oct. 14th, 1904.
"MR. ISAAC C. SUTTON,
"Dear Sir:—We agree to pay to you if you recover the properties at corner of 49th and Haverford avenue for us $1,000, or if the value of the properties above encumbrance does not exceed $4,000, we will allow you one-fourth of the value of the properties or 1-4 of any amount recovered."

This was signed by Mary Clough, Alice Rose and George W. Clough. The name of Martha Harmon appended to the letter was written by her twin sister, Mary Clough. At this time the plaintiff could read and write only with the greatest difficulty, being very near-

sighted and rapidly growing blind. This fact probably explains how Miss Clough happened to sign Mrs. Harmon's name to the paper.

5. At a subsequent interview with the plaintiff, when Mrs. Rose and Miss Clough were present, Mr. Sutton received the sum of $15.00 to cover the expenses involved in examining the title of the Haverford avenue properties. This payment was made up of contributions from each of the three women, but it was handed to Mr. Sutton by Mrs. Harmon and his receipt for it was made out in her name.

6. A thorough investigation of the matter upon which he had been consulted led Mr. Sutton to the conclusion that nothing would be gained by a further effort to have the orphans' court sale of the Clough properties set aside. He accordingly advised his clients to wait for an opportunity to buy them back at sheriff's sale in the foreclosure proceedings which he was informed were about to be instituted by The Pennsylvania Company for Insurances on Lives and Granting Annuities on the mortgage which it held upon them. This course they determined to adopt; but their sister Mrs. Nields managed to pay the mortgage interest and thus stave off foreclosure as long as she lived.

7. On February 13, 1909, Mrs. Nields committed suicide; and Mr. Sutton was immediately appealed to by the plaintiff, Miss Clough and Mrs. Rose to carry out the plan that he had recommended. George Clough, who said that he was tired of litigation and not disposed to risk more money in costs, declared that he would have nothing further to do with the matter. As a preliminary to beginning work upon it, Mr. Sutton called his three remaining clients to his office, and, having read over to them their letter of October 14, 1904, asked them to confirm it. This they did by each writing her signature beneath the words "This agreement is confirmed Feb. 18, 1909," that were added at the foot of the letter. By this time Mrs. Harmon's sight had failed so much

that, while she could dimly perceive the figures of those around her, she could not read at all. The contents of the letter, however, as has just been stated, had been read over to her; and she perfectly understood what it was that she was confirming by her signature.

8. Considering that the work involved in acquiring the properties for his clients under the plan adopted would be less than would have been the case under the proceedings originally contemplated, and in view of the fact that George Clough had dropped out of the enterprise, Mr. Sutton informed his clients that his charge for his services would be $700 instead of $1,000.

9. At the interview in his office when the amount of his fee was discussed, it was orally agreed by the plaintiff and her two sisters that the title to the properties when obtained should be placed in her name and be held by her during her life or until she should marry, and that on her death or marriage the properties should go to Mrs. Rose and Miss Clough share and share alike, but that in the event that they should be sold during her lifetime, their proceeds should be equally divided between the three of them, it being understood that their rentals should meanwhile be received by the plaintiff, who was, however, to pay out of the rent the expenses incidental to carrying them. A memorandum of this agreement, in the shape of a letter addressed to Mr. Sutton, was prepared by him. That was read and carefully explained to his clients. Mrs. Harmon understood it thoroughly, and with a full understanding of its contents, joined her two sisters in signing it. The letter reads as follows:

"March 25, 1909.

"Mr. Isaac C. Sutton,

"301 Franklin Bldg.

"Dear Sir:—We hereby retain you to act as our attorney in suit to recover the properties Nos. 4847 and 4849 Haverford avenue, Philadelphia, the title to which

is now in Benjamin R. Nields, and as compensation therefor we agree that you shall receive $700, which you are to endeavor to raise by second mortgage on said properties. It is agreed between us that the title to the property shall be placed in the name of Mrs. Martha Harmon, to hold for her life or until she marry, and at her death or marriage it is to go to Miss Mary Clough and Mrs. Alice Rose to share and share alike. In case of sale, the proceeds are to be equally divided between us.

> "Very truly yours,
> "MARTHA HARMON
> "MARY CLOUGH
> "ALICE ROSE."

10. Mr. Sutton's plan for securing the Haverford avenue properties for his clients was in general outline as follows: The mortgage interest being in default, the mortgagee was to be invited to foreclose. The properties were to be bid in at the sheriff's sale by somebody who should hold them until the financial arrangements of his clients could be carried out. These contemplated the raising of a loan of $2,500 upon them under a first mortgage, and the borrowing of as much more as could be obtained by way of second mortgage loan from a building society. With the money thus secured Sutton was to pay off the principal and interest due the Pennsylvania Company for Insurances on Lives and Granting Annuities, the costs of the foreclosure proceedings, the back taxes and water rent, and the expenses involved in creating and negotiating the new mortgages. Anything remaining after this was done was to be applied on account of his fee. After the creation of the two mortgages, the properties were to be conveyed, subject thereto, to Mrs. Harmon; and she was to hold them under the arrangement set forth in the letter of March 25, 1909, above mentioned.

11. This plan was successfully carried out. The mort-

gage created by Nields was sued out. The properties were sold by the sheriff on a levari facias June 7, 1909, and bid in in the interest of Mr. Sutton's clients. Twenty-five hundred dollars were borrowed on first mortgage of them from Elizabeth F. Rieger. Five hundred dollars were borrowed from the Baltimore Avenue Building and Loan Association on a second mortgage of them. The claim of The Pennsylvania Company for Insurances on Lives and Granting Annuities was paid in full. All taxes and water rents due on the houses were paid. The costs and necessary expenses of the transaction were paid. And a balance of $55.72 was left in Mr. Sutton's hands.

12. Mr. Sutton's clients seem to have assumed possession of Nos. 4847 and 4849 Haverford avenue immediately on the death of Mrs. Nields. Their agents, Kaester & Walter, certainly accounted to Mr. Sutton in July, 1909, for rents collected as far back as the previous February, and turned over to him net collections during the intervening period amounting to $126.24. Out of the $181.96 made up of that payment and the sum of $55.72 left over from what was raised on mortgage of the properties, Mr. Sutton paid himself $150 on account of his fee (which he fixed at $500 instead of $700 as agreed upon in the letter of March 25, 1909, supra), and took a judgment note signed by Mrs. Harmon for the balance of $350 that was due him. The note was read to Mrs. Harmon, and she clearly understood what it was when she signed it. It was executed July 30, 1909, at Mr. Sutton's office. Subsequently Mrs. Rose also signed it. It was arranged between Mr. Sutton and his clients that he should take charge of the properties, receiving a nominal compensation for doing so, and that out of the rents collected he should pay the taxes, interest, building association dues, water rents and the cost of repairs. One-half of the net rents was to be applied to the payment of his note. The remainder was to be paid to Mrs. Harmon. He received but $40.87 on account of the

note before Mrs. Harmon withdrew the houses from his management.

13. The properties were conveyed by the sheriff by deed dated June 28, 1909, to Stanley W. Bruce, by whom the two mortgages above mentioned were executed. By deed dated July 2, 1909, they were conveyed by Bruce to Mrs. Harmon subject to those mortgages. On the date last mentioned, in pursuance of the agreement set forth in the letter of March 25, 1909, above quoted, Mrs. Harmon executed, delivered and acknowledged a deed of which the following is a copy:

"To all to whom these presents shall come, I, Martha Harmon of Philadelphia, send greeting.

"Whereas I, Martha Harmon, Mary Clough and Alice Clough Rose, of the City of Philadelphia are the purchasers at Sheriff's sale of all those certain lots with the Buildings thereon erected, being Nos. 4847–4849 Haverford Avenue Situate in the Thirty-fourth (formerly part of the Twenty-fourth) Ward of the City of Philadelphia described as follows, to wit, Beginning at the Northeast Corner of Forty-ninth Street and Haverford Avenue, thence extending Eastward along the North side of the said Haverford Avenue thirty-eight feet, thence Northward on a line at right angles with the said Haverford Avenue Thirty-four feet more or less to a point, thence still Northward on a line at right angles with Wallace (formerly called Irving Street) Forty-five feet more or less to the said Wallace Street, thence Westward along the South side of the said Wallace Street Forty feet and five-tenths of a foot more or less to the East side of Forty-ninth Street aforesaid, thence Southward along the East side of Forty-ninth Street Fifty-six feet and eleven inches to the North side of Haverford Avenue the place of beginning, and,

"Whereas the title to said properties has been conveyed to me the said Martha Harmon by Indenture bearing date the 2nd day of July and recorded in Philadelphia in Deed Book W. S. V. No.        page

&c. by virtue of an agreement between me and the said Mary Clough and Alice Clough Rose that said property will be held by me for my use to collect the rents and profits, to pay the taxes, water rents, interest on mortgages, repairs and other expenses of said properties, and to use the balance for my maintenance and support,

"Now know ye that I, the said Martha Harmon, do hereby acknowledge and declare that the said properties, to wit, 4847–4849 Haverford Avenue are held by me in trust for the said Mary Clough and Alice Clough Rose, their heirs, executors and assigns for the following uses to wit, to be conveyed by me to them the said Mary Clough and Alice Clough Rose share and share alike in case of my marriage, in case of my death to go to them the said Mary Clough and Alice Clough Rose share and share alike, in case of the sale of the said property before my death, the proceeds of such sale to be divided equally between me the said Martha Harmon and the said Mary Clough and Alice Clough Rose.

"In witness whereof I have hereunto set my hand and seal this 2nd day of July, 1909.

'MARTHA HARMON.

"Sealed and delivered in the presence of

　　　"GEORGE F. KNIGHT
　　　"WILLIAM ROSE."

14. This declaration of trust was read and its meaning fully explained to and understood by Mrs. Harmon before she executed it. It was not placed on record immediately, because it was thought that the sale of the properties would be more readily made, if it were not known generally that such an incumbrance on the title existed.

15. In view of the fact that the declaration of trust was not recorded, and for the purpose of carrying out

the arrangements contemplated by his clients and set forth in the letter of March 25, 1909, supra, Mr. Sutton advised Mrs. Harmon to make a will, and, at her request, drafted one for execution by her. Its second clause reads as follows:

"Second: I give and bequeath unto my beloved sisters Mary Clough and Alice Clough Rose as joint tenants for life, the store No. 4847 Haverford Avenue and the store and dwelling No. 4849 Haverford Avenue in the City of Philadelphia, and upon the death of one of them, the same shall go and vest in the survivor of them and her heirs in fee simple, notwithstanding the Act of Assembly of the Commonwealth of Pennsylvania against the creation of a joint tenancy, and I authorize and empower my said sisters to sell, if they see fit, either of the said properties, the proceeds thereof to be equally divided between them."

Why this will devised the properties to Mary Clough and Alice Rose as joint tenants instead of making them tenants in common thereof, as the declaration of trust provides, has not been explained. It is not unlikely that the change was due to some family consideration that then bulked large in the minds of the three women directly concerned. However that may be, Mr. Sutton drew the will only after consultation with all of them, and it was not executed by Mrs. Harmon until he had read it and explained it to her.

16. In the spring of 1910, the tenant of No. 4849 Haverford avenue vacated it. Mr. Sutton, thereupon, with the knowledge and consent of the plaintiff, as her attorney in fact, executed a lease thereof to William Rose, from whom she and his sister Mary Clough sublet one of its third floor rooms. Miss Clough, Mrs. Harmon and the Rose family moved into this building on April 11, 1910.

17. Less than a year elapsed before disputes arose between Mrs. Harmon and Mrs. Rose. It is unnecessary to go into the question of the rights and wrongs of these

unfortunate differences. Their consequence was that Mr. and Mrs. Rose determined to move elsewhere unless Mrs. Harmon and Miss Clough would leave the house. The intervention of Mr. Sutton, however, and the opportunity that was presented of securing the location of the polling place of the election division in No. 4847 Haverford avenue, then vacant, suggested an arrangement acceptable to all concerned. Under this Mr. Rose retained No. 4849 Haverford avenue and leased No. 4847 Haverford avenue also; while Mrs. Harmon and Miss Clough left their room in the former building and took up their quarters in the two back rooms on the ground floor of the latter, paying the same rent for these that they had before paid for the single room that they had occupied. The plaintiff and Miss Clough moved into their new rooms on July 17, 1910.

18. Although for a short time peace prevailed, Mrs. Harmon soon quarreled again with Mrs. Rose. Her feelings were hurt by her exclusion from the Rose house. She was lonely in her new quarters when her sister Mary Clough left her by herself while she went out to her work. The question was raised why Mrs. Harmon, although undoubtedly a subtenant, should be obliged to pay rent for part of a property for which she had a deed, and she felt deeply wronged because she had to do so. The result of all this was that the plaintiff, egged on by her sister-in-law, and forgetful of their agreement and her declaration of trust, determined to cut Mrs. Rose off from all share in the properties after her death, and, in September, 1911, executed a new will devising them, as if they were absolutely her own, to Mary Clough.

19. Mary Clough died January 30, 1912.

20. Soon after this event, Mrs. Rose was informed of the new will that the plaintiff had made, and she at once carried the tale to Mr. Sutton. When the latter remonstrated with the plaintiff on her breach of the agreement under which the properties were conveyed to her, and reminded her of her declaration of trust, her resentment

was at once aroused, and she jumped to the conclusion that he was taking sides against her and was acting in league with Mrs. Rose. Several months later Mrs. Harmon dismissed Mr. Sutton from the charge of the Haverford avenue properties.

21. Mary Clough died intestate. Her heirs at law were her brother, George W. Clough and her five sisters, Alice C. Rose, Maria M. Onimus, Clara G. Boyle, Laura McGraudy and Martha C. Harmon. George W. Clough has since died intestate leaving to survive him his widow, Margaret L. Clough, and two daughters, Laura C. Scudder and Alice Rebecca Bristow, who are his heirs. Maria Onimus also has died. Her heirs are Wallace B. Onimus and Louise Cummins. Letters of administration d. b. n. have been granted to Herbert E. Davison on the estate of Mary Clough. All of the persons mentioned herein have been made parties defendant to the bill and have either appeared herein or have been duly served with process.

22. Alice C. Rose was never a tenant of either No. 4847 or No. 4849 Haverford avenue, although she frequently attended to paying the rent. Both of those properties were lawfully leased to William Rose. His rent to the date of the filing of the bill was paid in full.

23. Throughout the transactions above set forth, Mr. Sutton, in all his dealings with the plaintiff, acted with absolute fidelity to her interests and was guilty of no fraud or duplicity. In these matters he did not represent Mrs. Harmon alone. Mrs. Rose and Miss Clough were also his clients. This the plaintiff understood and consented to. No advantage was taken by Mr. Sutton or by either of her sisters of Mrs. Harmon's unfortunate infirmity. Whatever she was asked to do or join in doing was fully discussed with her. Mr. Sutton executed no leases of the Haverford avenue properties without first obtaining her consent. All papers to which she was asked to sign her name were read over to her and carefully explained to her before she signed them.

In the matter of his fee, Mr. Sutton was very reasonable. In view of unforeseen circumstances and the poverty of his clients, he voluntarily relinquished half of what had originally been promised him, and then permitted them to make payment in the way that was most easy for them. His conduct in this entire matter was beyond all criticism.

### DISCUSSION

It seems unnecessary that much should be said in support of the conclusions reached as to the facts. The plaintiff's case rests almost entirely upon her own testimony. This is totally at variance with the writings that she signed. To evade the effect of these, she points out that she could not read them for herself, and asserts that she was led to sign some of them without being given any information as to their contents and that the contents of others were misrepresented to her. In each instance she is contradicted by several witnesses. In one instance, that of the note given to Mr. Sutton for his fee, she herself contradicts in her testimony what she averred in her bill. It may, of course, be said that Mr. Sutton, Mrs. Rose and Mr. Rose are interested witnesses. But is Mrs. Harmon herself without interest in this matter? The statements made by them seem straightforward and plausible. They describe incidents as happening in a way that is natural and probable. None who heard Mrs. Harmon's testimony could escape the impression that as to anything affecting her interests or in which anyone toward whom she cherishes animosity is concerned she is utterly unreliable. As to many trifling matters her recollection is very distinct. This is particularly apt to be the case when these trifles are useful in giving color and setting to the statement of something that she thinks tells in her favor. Upon matters far more likely to catch the attention she is singularly hazy and forgetful when they happen to be unfavorable to her interest. It is by no means unlikely

that this peculiarity is not the result of conscious mendacity, but is caused, to some extent, by her loss of sight. Her blindness has cut her off from one great source of mental impressions. The impressions that she still receives not being modified and corrected as they would be if she could see, the due balance of her mental operations is disturbed, and her memory has become abnormal. Whatever impression convenes with her desires remains unnaturally vivid and distinct. Whatever fails to fit in with the subject of her hopes fades quickly away. On subjects, therefore, upon which she has thought most intently she is least likely to be reliable. Whether this theory accounts satisfactorily for the vagaries of Mrs. Harmon's memory or not, is really quite unimportant. The fact is that her memory is bad. As her sister-in-law Mrs. Clough (who was a witness not at all unfriendly to the plaintiff) puts it: "Sometimes she will tell you a thing, and the very next day she forgets it." The value of her testimony is consequently slight, and, when contradicted by other witnesses of unimpeached veracity, should be rejected.

Upon the facts above stated the following are the only proper

### CONCLUSIONS OF LAW

1. The plaintiff's essential averments are not sustained by the evidence.

2. The bill must be dismissed and the plaintiff should be required to pay the costs herein.

*Error assigned* was the decree of the court.

*J. Lawrence Wetherill,* for appellant.

*Owen J. Roberts,* for appellee.

PER CURIAM, November 16, 1914:

The decree is affirmed at the costs of the appellant upon the findings and opinion of the learned trial judge.